IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

JACKIE CARTER,

                              Plaintiff,                         OPINION AND ORDER

    v.                                                                  12-cv-574-wmc

MICHAEL MEISNER, JANEL NICKEL,
DONAL MORGAN, JOANNE LANE,
MARY LEISER, DR. DALIA SULIENE,
KAREN ANDERSON, THOMAS F.
SCHOENEBERG, RICHARD DONOVAN,
and RAYMOND BANDEKO,

                              Defendants.

Long-time Columbia Correctional Institution ("CCI") inmate Jackie Carter alleges that defendants, mainly CCI employees, violated his rights under the Eighth Amendment and 42 U.S.C. § 1983 by deliberately ignoring his serious medical, basic clothing and footwear needs. Defendants have moved for summary judgment on several grounds. (Dkt. #70.) Because Carter has failed to come forward with sufficient evidence to support his remaining legal claims, the court will grant defendants' motion in full and enter judgment in their favor.

UNDISPUTED FACTS[1]

**A.  The Parties**

Plaintiff Jackie Carter is, and was for all times relevant to this action, an inmate incarcerated at CCI.  Defendants are or were employees of the Wisconsin Department of Corrections ("DOC").   Among current employees at CCI are:  defendants Karen Anderson, the Health Services Manager since December 5, 2011; Dr. Dalia Suliene, a physician; Raymond Bandeko and Richard Donovan, both sergeants; and Donald Morgan, an Administrative Captain since October 2010.  Among past employees at CCI are:  defendants Thomas Schoeneberg, previously employed as a Lieutenant; Joanne Lane previously employed as the Institution Complaint Examiner ("ICE"); Mary Leiser, a Program Assistant Advanced Confidential; and Nickel, the former Security Director.  Defendant Michael Meisner is the Warden at CCI, and has held this position since April 24, 2011.  Prior to that, Meisner was the Deputy Warden at CCI.

**B.  Relevant Period of Carter's Claims**

In *Carter v. Radtke*, No. 09-cv-437 (W.D. Wis. filed July 13, 2009), Carter pursued claims against DOC personnel related to his footwear, medications and healthcare more generally for events that occurred before May 18, 2010.[2]  With the exception of the Eighth Amendment complaint against defendant Bandeko based on the alleged denial of

---

[1] The court finds that the following facts are material and undisputed, unless otherwise noted.

[2] While Carter filed his original complaint in that case on July 13, 2009, he filed an amended complaint on May 18, 2010, and it was that complaint which was screened to go forward.

clothing, the relevant period of Carter's claims is from May 18, 2010 (the date of filing of Carter's amended complaint in No. 09-cv-437), and July 30, 2012 (the date of filing of his complaint in this action).

During this period of time, Carter's status varied as follows:

- May 4, 2010, to June 11, 2010: general population;

- June 11, 2010, to December 29, 2010: segregation;

- December 29, 2010, to January 6, 2011: general population;

- January 6, 2011, to July 21, 2011: segregation; and

- July 21, 2011, to October 22, 2012: general population


**C.  Denial of Footwear**

Carter has been diagnosed with peripheral neuropathy, a condition that causes numbness and pain in the hands and feet.  On February 12, 2010, Carter was issued a patient special needs form for size 15, state-issued, high-top boots for Carter to wear while at CCI per his podiatrist.  While assigned to the general population from May 2010 through July 2012, there is no dispute that Carter was issued and had access to high-top boots for his use at all times.  Carter was also approved for the use of a wheelchair for longer distances, including to attend appointments in the Health Services Unit ("HSU").

When Carter was housed in segregation during the relevant time period, he had possession of state-issued, Velcro high-top boots, similar to those depicted in the photograph below:

3



(Declaration of Dylon Radtke ("Radtke Decl."), Ex. K (dkt. #75-11).)[3]  When Carter was housed in the general population during the relevant period of this lawsuit, he had access to (1) at least one pair of his personal shoes, (2) orthotics to use in his personal shoes, and (3) state-issued, high-top boots with shoelaces (rather than Velcro).

In January 8, 2012, defendant Bandeko offered Carter replacement, size 15 high-top boots, which Carter refused to accept because the replacements were in used condition.   Bandeko subsequently checked with HSU Manager Karen Anderson and with other staff members, all of whom confirmed that (1) used boots were fine so long as they were in good condition, and (2) Carter had no medical need for brand new boots. Bandeko then inspected Carter's boots and found them to be in "serviceable condition," explaining:  "The outer soles are solid and do not show excessive wear.  The leather

---

[3] On September 15, 2010, a second pair of new boots was delivered after Carter claimed to have lost the first pair.

uppers do show wrinkles from wear but are solid." (Declaration of Raymond E. Bandeko ("Bandeko Decl."), Ex. D (dkt. #71-4).) At that time, Bandeko also provided Carter with new shoelaces, since Carter claimed that the old laces had broken and he had thrown them away.

In addition to his exchange with Bandeko, defendant Morgan also sent Carter a memorandum, explaining that he asked Bandeko to look into Carter's concerns about his boots and that Bandeko had found his current boots in good condition. (Declaration of Donald Morgan ("Morgan Decl."), Ex. W (dkt. #74-23).) Despite these steps, Carter testified generally at his deposition that the footwear was "painful[,] didn't fit" and did not provide adequate support for his ankles. (Deposition of Jackie Carter ("Carter Depo.") (dkt. #69) pp.337-38, 340-43.)

In contrast, all of the named defendants to this claim -- Bandeko, Donovan, Schoeneberg, Morgan, Nickel and Meisner -- aver that they were not informed by the Health Services Unit or any other DOC personnel that Carter's footwear was inadequate to meet his alleged medical needs. (Defs.' PFOFs (dkt. #83) ¶¶ 24-29 (citing to each defendant's respective affidavit).) At all relevant times, the defendants also swear they each believed Carter was provided with adequate footwear.[4] (*Id.*) In response, Carter testified at his deposition that "I told them they didn't fit. I told them they were painful. I told them I tried everything." (Carter Depo. (dkt. #69) 340.)

---

[4] In addition, defendants point to memorandum documenting Carter's continued refusal to meet with DOC personnel in an attempt to resolve his footwear issues. (Defs.' PFOFs (dkt. #83) ¶ 41.)

In July 2012, Sergeant Todd Anderson documented Carter's participation in outdoor recreation, because the level of his participation appeared wholly at odds with Carter's claim that he needed to use a wheelchair to travel long distances within the institution. On July 14, 2012, Anderson observed Carter walking under his own power to recreation and another officer observed him running and walking around the track. Similarly, on July 16, 2012, Anderson observed Carter walking to recreation and then walking laps. On July 21 and 23, 2012, Anderson again observed Carter walking on his own volition to recreation. On July 30, 2012, Anderson observed Carter walking to recreation and was later informed by another officer that he was doing jumping jacks and squat thrusts (an exercise where a person crouches down, extends his legs straight back into a push-up like position, back into crouching and finally back to a standing position).[5] In response to all of this, Carter simply states that "[d]efendants have admitted that [he] had a need and was given therapeutic shoes and for the use of a wheelchair based on [his] medical conditions." (*See, e.g.*, Pl.'s Resp. to Defs.' PFOFs (dkt. #90) ¶ 42 (citing Defs.' PFOFs (dkt. #83) ¶¶ 17-18).)

### D. Denial of Clothing

Carter admits that his claim concerning denial of clothing only pertains to the period of time that he was in the general population after July 21, 2011, until his filing of

---

[5] In October 2012 and April 2013, Carter was also *videotaped* playing full-court basketball. (Defs.' PFOFs (dkt. #83) ¶ 48.) Although these events occurred after Carter filed the present lawsuit, they undermine Carter's claims of serious, chronic physical limitations, as well as his credibility generally.

this lawsuit on July 30, 2012. During this one-year period, Carter claims he was issued only one set of clothing upon his release from segregation and that he had that same set for the entire time he was in the general population until October 22, 2012. The court granted Carter leave to proceed on this claim against defendant Bandeko.

Normally, inmates in the general population are provided with the following articles of clothing: 4 pairs of socks, 4 pairs of underwear, 4 t-shirts, 3 pairs of pants, a spring jacket, a winter coat, 3 towels and 3 wash clothes. These items are each tagged with the inmate's name and a color dot indicating the inmate's housing unit.

When Carter was released from segregation in July 2011, Bandeko was not involved in the provision of clothing. In fact, he did not start working in the laundry until December of 2011. According to laundry records, Carter's tagged clothing items were sent to Housing Unit No. 8 on July 22, 2011. Carter then sent a request asking to change sizes for some of his clothing. According to the records, on July 24, 2011, Carter was sent new sizes for 4 t-shirts, 3 pairs of pants and 4 pairs of briefs.

If an inmate believes he is missing an item, he may submit a request to the laundry. According to CCI's laundry records, at no time did Carter submit a request stating that any of his state-issued tagged cloths were missing or lost. Carter disputes this, stating that he did submit requests for clothing.[6]

In his deposition, Carter acknowledges his ability to clean clothing by using soap available to him, though he also testified that he was not *permitted* to launder his clothing.

_____

[6] Defendants acknowledge that "there are times when the logs are not completely accurate due to the inmate clerk not appropriately doing his job." (Defs.' PFOFs (dkt. #83) ¶ 55.)

This was because his name was not on the clothing, making his only recourse was to attempt to wash his clothes by hand in his sink.  (Carter Depo. (dkt. #69) 254, 268-69, 298-99.)  Carter also claims that the issued underwear were dyed to cover up old stains.

Carter further acknowledged at his deposition that he had access to additional clothing and towels in the "dumpster" outside of the laundry room.  In response to defendants' proposed findings of facts, Carter states that the dumpster contained "cast-off articles that had been used as paint rags and used to clean floors."  (Pl.'s Resp. to Defs.' PFOFs (dkt. #90) ¶ 52.)  From the court's review of Carter's deposition testimony, it appears that these rags were typically retrieved from the dumpster for use in buffing the floors, *not* that the dumpster contained rags previously used in painting or cleaning floors.  (Carter Depo. (dkt. #69) 267 ("They keep a dumpster by the laundry room that they use for rags.  Utility workers use them.  They tie them to the bottom of the buffer and buff the floors with them, stuff that's out of commission.").)

### E. Denial of Methadone[7]

Carter's claim relating to pain medication concerns changes to his Methadone prescription in 2010 and 2011 and eventual discontinuation of that prescription in June 2012. Drs. Suliene, Anderson and Nickel are the defendants to this claim, the latter in her role as a supervisor.

On October 23, 2009, Dr. Suliene saw Carter and provided him with consult appointments at Podiatry (November 9, 2009), and Neurology (December 14, 2009) at UW Hospital. At that time, Carter was prescribed Nortiptyline 25 mg at bed time and Methadone 30 mg twice per day for pain management. Dr. Suliene also continued Carter's order of Gabapentin for neuropathic pain from a previous order issued on June 29, 2009. In addition, Dr. Suliene prescribed topical Capscaisin ointment for his feet. All of these medications are used for the treatment of chronic pain due to neuropathy and/or arthritis.

Pursuant to Carter's November 2009 appointment with a podiatrist, Carter was issued special foot orthotics. The podiatrist also recommended increasing Carter's

---

[7] Defendants propose a number of proposed findings of facts about Carter's medical care from May 2010 through February 2012, most of which are not mentioned in their summary judgment brief. Defendants presumably submit these findings to demonstrate that (1) Carter's lack of compliance with or refusal to follow medical treatment, including failing to take prescribed medications; (2) the efforts made by Dr. Suliene and other members of the medical staff to address Carter's myriad medical complaints; and (3) Carter's ability to ambulate easily and lack of focus on pain management in some of these medical appointments. (Defs.' PFOFs (dkt. #83) ¶¶ 75-80, 83-91, 107-147.) While perhaps tangentially relevant to plaintiff's claim, the court need not recount these facts given the court's finding below that Carter failed to put forth sufficient evidence to demonstrate that the Methadone prescription was required to treat his pain disorders or that the discontinuation of the prescription resulted in a serious medical need.

Nortiptyline dose to 50 mg at bed time and decreasing his Methadone dosage to 25 mg twice per day.   In December 2009, Carter's medications were adjusted further after Carter's appointment with the neurologist.   Carter's Gabapentin dosage was increased to 300 mg three times per day; he was also prescribed Pregabalin (Lyrica) and/or Duloxetine.   Carter's Methadone dosage was continued at 25 mg twice per day and later reduced to 20 mg twice per day.[8]

On June 30, 2011, Dr. Correll -- who is not a defendant to this action -- performed a review of Carter's chart and again decreased Carter's prescribed Methadone from 20 mg twice a day to 10 mg twice a day.  Dr. Suliene was on leave at that time and was not aware of this dosing change.

On June 2, 2012, the nursing staff observed Carter "tucking" a methadone tablet under his tongue.  When asked to show his mouth, Carter refused.  When asked a second time, Carter took two more drinks of water and moved his tongue back and forth.  When Carter was asked to lift his tongue a third time, he lifted the front, at which point the nurse reported seeing the pill under his tongue.  Carter then became agitated.  At that point, a captain was notified of the occurrence, and a call was placed to Dr. Kelley to "crush" Carter's medication temporarily until Dr. Suliene could review.  Carter maintains that he did not "tuck" any pills, but admits being issued an adult conduct report based on this incidence.

---

[8] In April 2010, the Methadone dosage was decreased to 20 mg twice per day, but the court previously concluded that the April 2010 change in dosage did not constitute deliberate indifference.  *Carter v. Radtke*, No. 09-cv-437, slip. op. at 15-16 (W.D. Wis. May 30, 2013) (dkt. #153).

On June 4, 2012, Dr. Suliene discontinued Carter's Methadone prescription altogether based on his alleged misuse of drugs. In discontinuing the Methadone, Dr. Suliene did not anticipate that Carter would experience any significant side effects, at least in part because Carter had by that time been taking a very low dosage and significant side effects are not typical when a patient stops taking a low dose. Without any additional proof (by way of actual studies, experience or opinion) Carter would dispute this based solely on his belief that Dr. Suliene discontinued this medication for the purpose of causing him pain and in reprisal for Carter's use of the DOC's inmate complaint system.[9] In contrast, Dr. Suliene avers that all of her decisions regarding Carter's medications were based on her professional medical judgment and consistent with the community health care standards, as well as the protocols of the Department of Corrections.

On June 6, 2012, Dr. Suliene saw Carter for reflux concerns. During that appointment, Carter raised no concerns about the discontinuation of his Methadone prescription. On June 13, 2012, Carter saw Dr. Suliene again for chest pain and groin pain, which Carter attributed to his Methadone being discontinued. Dr. Suliene rejected Carter's explanation. During the appointment, Carter also complained about nausea, vomiting and diarrhea, as well as that his GERD was acting up.

---

[9] As for the latter, defendants correctly point out that Carter was not granted leave to proceed on a retaliation claim in this action.

### F. Neurology consultation

Carter was not seen by a neurologist from May 2010 to July 2012, the relevant period of this lawsuit.

### G. ICRS

In *Carter v. Radtke*, No. 10-cv-510, slip op. at 16-18 (W.D. Wis. Oct. 30, 2014) (dkt. #93), the court recounts in detail the general operation of the ICRS and ICE's specific process in reviewing inmate complaints. Rather than recount those facts again here, the court incorporates those findings by reference, including in particular those findings involving Lane and Leiser's respective roles in the process. Even more specific to this case, the ICE office accepted over a dozen of Carter's offender complaints relating to footwear in the 2010-2012 timeframe. In three of the complaints, all of which were dismissed, Carter raised concerns about (1) not being issued "medically prescribed shoes," (2) lack of proper fit, and (3) being issued used (instead of new boots). During this same time, ICE also accepted one complaint from Carter during the relevant period of time regarding missing clothing. That complaint was also dismissed. In the 2010-2012 timeframe, ICE also accepted over a dozen complaints from Carter relating to his medications, including specifically his Methadone prescription.

### OPINION

Carter was granted leave to proceed on the following five claims: (1) an Eighth Amendment deliberate indifference claim against defendant Bandeko, Donovan,

Schoenberg, and Morgan for denying Carter his prescribed footwear and against Nickel and Meisner for failing to take action in their supervisory capacity after they knew that plaintiff did not have his prescribed shoes; (2) an Eighth Amendment deliberate indifference claim against Bandeko for withholding clothing; (3) an Eighth Amendment deliberate indifference claim against defendants Anderson, Suliene, and Nickel, concerning the discontinuation of medication; (4) an Eighth Amendment deliberate indifference claim against Suliene and Anderson for refusing to follow a neurologist's advice in treating his neuropathy; and (5) an overarching claim against Leiser and Lane for failing to process Carter's inmate complaints.   The court will address defendants' challenges to each claim in turn, including considering defendants' qualified immunity defense where asserted.

## I.  Eighth Amendment Deliberate Indifference Claims

Plaintiff asserts the following three claims related to his medical treatment:  (1) denial of footwear; (2) decrease and eventual discontinuation of his Methadone prescription; and (3) refusal to follow neurologist's advice.   For Carter's deliberate indifference claims to survive summary judgment, he is required to provide evidence from which a reasonable jury could find that (1) Carter had an objectively serious medical need and (2) defendants were deliberately indifferent to it.  *Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008).  Defendants argue that summary judgment is appropriate because a reasonable jury could find neither an objectively serious medical need, nor that

defendants were deliberately indifferent to it, from the limited evidence that Carter has put forth to date.  The court agrees.

### A.  Denial of Footwear

#### i.    Serious Medical Need

"A medical need is considered sufficiently serious if the inmate's condition has been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would perceive the need for a doctor's attention."  *Gomez v. Randle*, 680 F.3d 859, 865 (7th Cir. 2012) (quoting *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011)).  Here, the record demonstrates that Carter has been diagnosed with neuropathy, related to his diabetes, and had been prescribed special shoes or boots to treat this condition.  Despite plaintiff's failure to respond to defendants' specific argument, this evidence is sufficient to demonstrate an objectively serious medical need, or at least sufficient to allow that question to go to a jury.

Still, defendants contend that plaintiff has failed to demonstrate that the alleged denial of appropriate footwear "caused injury or a serious risk of injury."  (Defs.' Br (dkt. #84) 7 (citing *Jackson v. Pollion*, No. 12-2682, 2013 WL 5778991, at *3 (7th Cir. Oct. 28, 2013)).)  Of course, whether Carter suffered an injury *because of* defendants' alleged deliberate indifference is a distinct one from whether he had a serious medical need.  Ultimately, the court need not reach this issue.  This is so mainly because, as explained next, plaintiff failed to put forth sufficient evidence from which a reasonable jury could

find either (1) a denial of appropriate footwear; or (2) even if denied, that defendants were reckless in their treatment of his footwear needs.

### ii.    Deliberate Indifference

In *Gayton v. McCoy*, 593 F.3d 610 (7th Cir. 2010), the Seventh Circuit succinctly described the proof required to establish "deliberate indifference":

> [T]he plaintiff must show that the official acted with requisite culpable state of mind.  This inquiry has two components. The official must have subjective knowledge of the risk to the inmate's health, and the official also must disregard that risk. Evidence that the official acted negligently is insufficient to prove deliberate indifference.  Rather, deliberate indifference is simply a synonym for intentional or reckless conduct, and that 'reckless' describes conduct so dangerous that the deliberate nature of the defendant's actions can be inferred. Simply put, an official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. Even if a defendant recognizes the substantial risk, he is free from liability if he responded reasonably to the risk, even if the harm ultimately was not averted.

*Id.* at 620 (internal quotations and citations omitted).

Here, it appears to be undisputed that Carter had access to high-top shoes at all times relevant to his complaint.  While he may believe that the Velcro shoes issued while he was in segregation did not provide adequate support, the court previously found that these "boots with [V]elcro straps . . . fit the description discussed by UW Health podiatrist, Dr. Finnell, without creating security concerns." *Carter v. Radtke*, No. 09-cv-437, slip. op. at 14 (W.D. Wis. May 30, 2013) (dkt. #153).  As such, the court finds

Carter failed to put forth sufficient, contrary evidence from which a reasonable jury could find that Carter was denied footwear.[10]

Viewed as a whole, the undisputed record demonstrates that defendants responded reasonably to Carter's need for special footwear. There is no evidence that defendants acted intentionally or with reckless disregard of Carter's rights in failing to provide Carter the footwear he demanded. Even if Carter believed he was entitled to better footwear -- either ones without Velcro straps while in segregation or news shoes while in the general population -- this is not a basis for finding deliberate indifference. *See Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996) ("[W]hether one course of treatment is preferable to another [is] beyond the [Eighth] Amendment's purview"). Accordingly, the court will grant summary judgment to defendants on Carter's Eighth Amendment claim premised on footwear.

### B. Methadone Discontinuation

Carter also challenges the changes made to his Methadone prescription. First, as to the decrease in dosage in June of 2011, it is undisputed that Dr. Suliene was not involved in that decision. Therefore, Carter may not bring a claim concerning that event against Dr. Suliene. On the contrary, the crux of Carter's claim concerns Dr. Suliene's decision to discontinue Carter's prescription entirely in June of 2012. Regardless of her stated reason for that decision -- alleged misuse of the drug -- and any factual disputes

---

[10] The court also rejects Carter's claim premised on the provision of used shoes. Carter has failed to produce any evidence demonstrating that these shoes were somehow inadequate, much less that defendants were aware and deliberately indifferent to his needs.

surrounding the allegation of misuse, Carter has failed to put forth sufficient evidence, likely in the form of expert testimony, that:  (1) Methadone was either required to deal with Carter's pain conditions; or (2) the tapering and eventual discontinuation of a relatively low dose of Methadone would create (or somehow exacerbate) a serious medical need or pain.  Here, the court is only left with Dr. Suliene's credible testimony that she made the decision to discontinue his Methadone prescription -- as well as other treatment decisions related to Carter's pain -- based on her professional medical judgment, community health standards and DOC protocols, as well as her opinion that discontinuation of such a low dose of Methadone would result in no significant side effects.  Whether or not this proved to be true in Carter's particular case, or even if her judgment proved negligent, there is no evidence on this record to find that Dr. Suliene acted with deliberate indifference to Carter's medical needs.

Even if plaintiff *had* put forth sufficient evidence to raise a question of fact as to whether Dr. Suliene violated his constitutional rights, plaintiff has also failed to respond to Dr. Suliene's qualified immunity defense by directing this court to a case demonstrating that discontinuation of a particular pain medication while on other pain medications and prescriptions constitutes deliberate indifference.  Accordingly, the court will grant summary judgment to Dr. Suliene on this claim as well.

### C.  Refusal to Follow Neurologist's Advice

The court previously found that Dr. Suliene was not deliberately indifferent with respect to her actions in scheduling the November 2009 podiatry appointment and

December 2009 neurology appointment.  *Carter v. Radtke*, No. 09-cv-437, slip op. at 4, 10, 15 (W.D. Wis. May 30, 2013) (dkt. #153).  As such, any claim based on her alleged refusal to follow a neurologist's advice is limited to the relevant timeframe of this case -- May 2010 to July 2012.  Since there is no dispute that Carter did not see a neurologist during this time frame, defendants are entitled to summary judgment on this claim as well.[11]

## II. Eighth Amendment Conditions of Confinement Claim

Among other protections, the Eighth Amendment's prohibition against cruel and unusual punishment imposes upon prison officials the duty to provide prisoners "humane conditions of confinement."  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).  To constitute cruel and unusual punishment, however, conditions of confinement must be extreme.  In contrast, a general "lack of due care" by prison officials will never rise to the level of an Eighth Amendment violation because "it is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause."  *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

To demonstrate that prison conditions violated the Eighth Amendment, a plaintiff must allege facts that satisfy a test involving both an objective and subjective component. *Lunsford v. Bennett*, 17 F.3d 1574, 1579 (7th Cir. 1994).  The objective analysis focuses

---

[11] To the extent this clam is somehow related to the footwear or Methadone claims (*i.e.*, a claim that defendants failed to follow the neurologist's advice in maintaining his Methadone prescription or providing him with the medically-prescribed shoes), the court rejects this claim for the same reasons it granted defendants summary judgment on those claims.

on whether prison conditions were sufficiently serious that "a prison official's act or omission results in the denial of the minimal civilized measure of life's necessities," *Farmer*, 511 U.S. at 834, or "exceeded contemporary bounds of decency of a mature, civilized society," *Lunsford*, 17 F.3d at 1579. The subjective component requires an allegation that prison officials acted wantonly and with deliberate indifference to a risk of serious harm to plaintiff. *Id.* While Carter arguably meets the objective prong of this test, Carter's Eighth Amendment claim falters at the subjective prong.

### A. Objective Component

As recognized in *Farmer*, prisoners are entitled to clothing that is "at least minimally adequate for the conditions under which they are confined." *Knop v. Johnson*, 667 F. Supp. 467, 475 (W.D. Mich. 1987). Typically, a conditions of confinement claim premised on a denial of adequate clothing involves inadequate clothing to deal with extreme conditions. *See Mays v. Springborn*, 575 F.3d 643, 648 (7th Cir. 2009) (affirming dismissal of plaintiff's claim where prisoner did not show that "he was forced to be in the cold for long periods of time or that he suffered anything more than the usual discomforts of winter"); *Johnson v. Lappin*, 264 F. App'x 520, 523, 2008 WL 397575, at *3 (7th Cir. Feb. 14, 2008) (considering conditions of confinement claim based on being held in cold cell without adequate clothing). Here, Carter's claim concerns whether having only one set of clothing for approximately one year violates his constitutional rights

19

Part of insuring that a prisoner has minimally adequate clothing is that the clothes are cleaned or that the prisoner has an opportunity to clean the clothing himself. *See Benjamin v. Fraser*, 161 F. Supp. 2d 151, 178 (S.D.N.Y. 2001), *aff'd in part, vacated in part on other grounds*, 343 F.3d 35, 52 (2d Cir. 2003); *see also Lanfair v. Sheahan*, 878 F. Supp. 1106, 1112 (N.D. Ill. 1995) (holding that lack of clean clothing or means to launder clothing for an extended time could be unconstitutional).  Although Carter claims that he could not have sent his clothing to the laundry since they were not properly tagged, it is undisputed that Carter had access to soap and could have washed his set of clothing himself.  *Myrick v. Anglin*, 496 F. App'x 670, 675, 2012 WL 5870817, at *4 (7th Cir. Nov. 21, 2012) (finding prisoner failed to state Eight Amendment conditions of confinement claim where he did not claim that "he could not wash his clothes and bedding").

Still, Carter apparently only had *one* set of clothing, meaning he had nothing to wear while laundering that set of clothing.  *See Hazen v. Pasley*, 768 F.2d 226, 228 n.2 (8th Cir. 1985) (quoting district court's finding that "[a]lthough the practice of requiring detainees to wash and dry their own clothing is not unconstitutional per se, the Court finds that requiring detainees to wait in varying degrees of undress while their clothes are drying is impermissible"); *Evans v. Headley*, 566 F. Supp. 1133, 1138 (S.D.N.Y. 1983) (finding prisoner stated a claim under the Eighth Amendment where jail supplied only one set of clothing for 45-day period).  Perhaps Carter could have found a backup set of clothing in the "dumpster," but the current record at least permits a finding that this clothing was dirty and otherwise inadequate.  In light of all of this, the court concludes

that Carter has put forth sufficient evidence to meet the objective component of an Eighth Amendment conditions of confinement claim.

## B. Subjective Component

In order for a prison official to be deliberately indifferent to serious harm, he or she must *know* of that harm or the risk of that harm.  *See Pittman ex rel. Hamilton v. County of Madison, Ill.*, 746 F.3d 766, 778 (7th Cir. 2014) ("[D]eliberate indifference requires a showing that the defendants had actual knowledge that Mr. Pittman was at risk of serious harm and deliberately ignored that risk.").  Here, it is undisputed that Bandeko was not working in the laundry room when Carter was released from segregation into the general population, allegedly received ill-fitting clothing, and requested new sizes.  Indeed, Bandeko was not transferred to the laundry unit until December 2011, five months *after* Carter's transition to the general population.  Bandeko avers that he was not even informed of Carter's need for clothing, but if he had been informed "that he needed clothing, I would have issued it in accordance with the laundry room procedures.  I would have no reason to deny any inmate, including Carter, their clothing."  (Bandeko Decl. (dkt. #71) ¶ 17.)

Carter claims in his brief "that he personally spoke with Defendant Bandeko about [his] clothing needs and Bandeko did nothing to aid Carter in obtaining clothes." (Pl.'s Opp'n (dkt. #89) 10 (citing Carter Depo. (dkt. #69) 270, 296).)  The deposition testimony cited, however, does not support this statement.  Instead, Carter actually testified that he spoke with his unit sergeant, that the unit sergeant called down to

21

laundry and that the laundry never responded.  (Carter Depo. (dkt. #69) 270.)[12]  On this record, Carter has failed to put forth sufficient evidence demonstrating that Bandeko was aware of Carter's lack of clothing.  Accordingly, the court will grant summary judgment to defendants on this claim as well.

## III.  ICRS Claims

Finally, Carter was granted leave to proceed on a claim based on defendant Lane's and Leiser's refusal to process his grievances.  (6/7/13 Opinion & Order (dkt. #30) 7.) As far as the court can discern -- and the parties do not indicate otherwise -- there is no independent claim at issue here.  Rather, Carter's claim -- if he has one -- somehow implicates his Eighth Amendment claims.  However, the undisputed facts demonstrate that Leiser had no decision-making role in deciding whether to return, reject, dismiss or affirm Carter's offender complaints.  Lane was the sole decision-maker with Leiser fulfilling a pure administrative role on Lane's direction.  The undisputed record also demonstrates that Lane accepted offender complaints concerning all of the claims asserted in this lawsuit.  As such, any claim that Lane somehow blocked Carter from participating in ICRS is not supported by the undisputed record either.

---

[12] On page 296 of his deposition -- the other page cited in support of his statement that he personally spoke with Bandeko about his lack of clothing -- Carter responded to questions about the specific claim against Bandeko, but never testified that he spoke directly with Bandeko about his clothing needs.

ORDER

IT IS ORDERED that:

1)  defendants' motion for summary judgment is GRANTED; and

2)  the clerk of court is directed to enter judgment in favor of defendants and close this case.

Entered this 31st day of October, 2014.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge